Anderson, J.,
delivered the opinion of the court.
The bill alleges a parol contract between a father and his son for the sale and purchase of a tract of land; part performance by the son, so as to take the •case out of the statute of frauds, and the faithful performance of the contract on the part of the vendee. It charges that after the vendee and his heirs had held uninterrupted possession for near twenty years under the said contract, and had made valuable improvements on the place, the defendants, taking advantage of the advanced age and infirmities of the vendor, being in his eighty-eighth year, fraudulently procured of him a conveyance to them of the same land, and, soon after his death, which occurred in a few months after the execution of said conveyance, instituted an *739 -action of ejectment against them in the circuit court of Floyd county, to oust them from the possession of the said tract of land; and, they being unable to make their defence at law, recovered judgment them; and the bill prays that said conveyance may be set aside as fraudulent, the specific execution of said contract by a conveyance to the plaintiffs, the heirs of the vendee, who has departed this life, of the title to said tract of land, and an injunction to the execution of the said judgment in ejectment.
The defendants demurred to the bill, and also answered, denying its material allegations.
If the demurrer cannot be sustained, then the decision must depend on the question whether the evidence supports the allegations of the bill. The demurrer raises the question whether the bill alleges a parol contract, and such part performance of it as will take it out of the statute of frauds, which a court of equity can enforce by decreeing its specific execution. There are two agreements alleged by the bill. It is alleged, first, that the father and son agreed to enter the land .jointly, and to obtain a grant from the commonwealth for the same, in which they would be equally interested; and that this agreement was carried into effect and the grant' obtained. There is some foundation for this allegation in the evidence. The proof tends to show that there had been an entry made previously of the same land, for the benefit of the son, as early as 1846 or ’7; and that subsequently the father’s entry, ■survey and grant, in his own name, were intended by him wholly for the son. But the allegation of the bill is not fully sustained- as to this agreement; and it -seems to be abandoned or not insisted on by the plaintiffs, who rely upon the other agreement set out in the bill, that for and in consideration of the support and. *740 maintenance of Abner Lester, the father and his wife as long as they lived, by Abner Lester, Jr., the immediate ancestor of the plaintiffs, he should have the said tract of land; that is, the interest of the said Abner, the elder, which united with whatever interest he, the younger, might have therein, would invest him with the fee simple title to the whole. The question, raised by the demurrer is as to that contract. Is it such as a court of equity can specifically execute ?
There is perhaps no higher moral obligation than that which rests upon children to support their aged or infirm parents, who are unable and are destitute of the means to support themselves. And that man or woman who would deny the obligation, and who would withhold any aid it was in their power to give in the support of those, when in need, from whom they derived their existence, and who tenderly watched over and protected and nurtured them when in helpless infancy and childhood and until they were old enough and able to provide for themselves, would be justly chargeable with base ingratitude and impiety, and would meet with condemnation and reproach in any civilized community.
But this is an obligation which rests alike upon all the children of parents who need their assistance. And it is entirely consistent with this principle for a parent to throw this burden upon one of his children who is willing to undertake it, and to relieve the others from that burden, and to compensate him for it by agreeing to give him his land, or a part of it, as he might consider it adequate. It is surely competent for a parent to enter into an agreement with one of his sons to give him all that he has, in consideration of his agreement to support his father and mother as long as they live. (In this case there is evidence tend *741 Ing to prove that he had previously advanced his only other son, who is defendant in this suit and plaintiff in the writ of eiectment, with one hundred and fifty ^ ■acres of land.) And if the contract was fairly entered into, and is in writing, and the son performs his part of the agreement faithfully, there is no court of equity that would not enforce the agreement against the father, or his other children after his death who might set up a claim to the property. If the contract, when in writing, would be enforced as founded upon valuable consideration, it would in like manner be deemed a valuable consideration when the contract was by parol. And such a contract, when not in writing, stands upon the footing of other parol contracts for a valuable consideration.
With regard to parol contracts, whilst this court has ever regarded the statute of frauds as dictated by a wise and sound policy, and to be firmly enforced, yet it must be with that equitable construction which has been given to it, and which is coeval with the statute itself; to wit, that it was designed to prevent frauds, and should not be interpreted and enforced, so as to be made an instrument of fraud. The principles upon which courts of equity will enforce, specifically, parol contracts, upon the ground of part performance, are well settled, and have been repeatedly recognized by this court. When the parol agreement is certain and definite in its terms; and the acts in part performance refer to, result from, or are done in pursuance of the agreement; and the agreement has been so far executed, that to refuse to complete its execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation, “when these three things- coneur,” it was held by this court in Wright v. Pucket, 22 Gratt. 370, Judge Christian’s opin *742 ion concurred in by the other judges, “a court of equity will decree specific execution.”
The contract hereinbefore recited, as alleged in the-bill is certain and definite in its terms. The acts of part performance are thus alleged in the bill. “At the time this agreement was made, which it is believed never was reduced to writing, the land was in woods, and' under this agreement, Abner Lester, Jr., was put in possession; cut the first stick of timber on it; built a house, barn, stables, and such buildings and appurtenances as are usual; cleared out the land, cultivated it, planted out fruit trees, and in every respect used and enjoyed the land as his own, until the day of his death, which happened in the year 1862;” and the possession continued in his heirs until the present. The bill further alleges that Abner Lester, Jr., amply provided for and supported the said Abner, the elder, and his wife, as. long as he lived. And that after the death of Abner,. Jr., his children provided for and supported the said Abner, the elder,- and his wife, their grand-parents,, and took them to their house to live with them, that they might the better provide for their comfort, until they were inveigled away by the defendants, when they were very old, that they might carry out their-fraudulent purpose of defeating the execution of the aforesaid contract of the old man with Abner, Jr., of which they were informed; which purpose they accomplished, a short time before the death of the old man, by fraudulently procuring him, in violation of his contract with the deceased son, and in fraud of the rights of the plaintiffs, to execute to them, a conveyance of the land in controversy, and of his interest in a suit, which they had caused to be brought against, one of the plaintiffs, John W. Lester, for the use and occupation of the land in controversy, for one year. *743 It manifestly appears, therefore, that according to the allegations of the bill, the three things concur, upon the concurrence of which this court held in Wright v. Pucket, supra, that a court of equity will decree specific execution. It follows that the demurrer was not well taken, and that it ought to have been overruled,
It appearing then that the plaintiffs, by their bill, have presented a good case for specific performance, and for the relief which they seek, if sustained by the proofs; it only remains to enquire, are the material allegations of the bill sustained by the evidence in the record. The judge then proceeds to comment on the testimony, and arrives at the following conclusions:
There seems to be no doubt from the evidence, that Abner Lester, the elder, contracted to let Abner, his son have the land, but also that he gave assurance to him when he was about joining the army, evidently under the apprehension that he might not return, that the land was his, that his children should have it if he did not return, and that it would be a home for his family. And after the death of his son Abner, he renewed and confirmed the assm-ances to his children, that he had given it to their father, and that they by carrying out their father’s contract of maintenance and support, should have the land. And after the death of their father, he and their graudmother moved to his late residence and lived with them.
The evidence is also abundant to show the acts of part performance by the said Abner, Jr. That he entered and took possession of the land under his agreement with his father in the year 1853 or ’4; that he cleared out and cultivated it, and that he built a dwelling-house, barn and stables upon it; that he supported his father and mother from 1853 or ’4 until his death in 1862, and that after his death his children *744 took them to live with them, and supported them well; that they were very able and willing, and offered to continue to support them, until. they were persuaded by the defendants to leave them. There is the evidence of one or two witnesses, one of whom acknowledged himself an enemy of John W. Lester, who speak of some expression of dissatisfaction by the old man, and one of them of his sending a message to his son, F. W. Lester, to come and take him to his house. It would be strange if the defendants had been unable to create some dissatisfaction in the minds of the old people, and to make them think they were not treated as well as they might be. But the proof on the other hand is abundant that the old man was well pleased with his home with the children of his deceased son, and with their treatment of his wife and himself, and that he was very averse to leaving them, and that he complained of the pertinacity with which F. W. Lester had urged him to leave them and to live with him; that on one occasion said Fleming actually sent a man to convey him to his house, which was about eight miles distant, when he refused to go, and the man had to return without him; that he sent for him again, when he agreed to go only on a visit; that finally, however, in July 1867, the said Fleming W. Lester had him carried to his house; and there is much testimony to show that he was anxious to return to his home with his grandchildren; that he applied to different persons, and to Fleming himself, to have him taken back, or to lend him a horse to return, but without success; Fleming thought his horses were so poor and needed rest, that he could not let his father have one of them to return to his home, but kept the old man with him, and finally got him to execute the deed bearing date August 11th, 1870, conveying to *745 the defendants the land in controversy and his interest in a suit which Fleming doubtless caused him to have brought against John W. Lester for the rent of the place.
The contract which has been established between the old man and his deceased son, it is shown, was known to the defendants. They were all informed of that contract, and of its faithful performance too by their brother during his life, and of the care which his children had for their aged grand-parents, and the support they had provided for them by their hard work during the remaining period of about three years of the war, when it was so hard, even for those who were most favorably circumstanced, to obtain the necessaries of life, and of their continued and plentiful support of them as long as they allowed them to remain with them. They also knew that the plaintiffs were able and willing to take care of them, and support them as long as they lived, and offered to do' so in fulfilment of their father’s contract. But that was not satisfactory to these defendants. Was it that they were desirous of providing for the greater comfort of their aged parents? What could have begotten this new-born solicitude in their behalf? Where were they, that they could not visit them and minister to them during the lifetime of their brother Abner? And after their brother’s death we do not hear of their visiting them, or lending a helping hand for their support and comfort during that period of greatest trial and suffering this country has ever known whilst the war lasted, not even after their parents and the family of their deceased brother was deprived of the aid and comfort of his eldest son, who was called into the army, which must have been very soon after the death of his father. It is not until some time after the close *746 of the war that we. hear of their showing any solicitude in regard to their aged parents; and then it was,, as the sequel shows, not that they might minister to their necessities, but that they might get them in a situation in which they would be under their control, and which would enable them to dispossess their deceased brother’s children of their home, and to have it appropriated to themselves, having previously, in 1870, procured the old man to make them a deed.
It is a noticeable fact that, in 1866, Fleming Lester,, onhis own motion, was declai-ed a lunatic, and that,in July 1870, he had himself discharged from the committee of lunacy; and in August, about one month, after, this deed was made.
In July 1871 they instituted an action of ejectment against them, soon after the death of their grandfather, to expel them from their home.
I am of opinion that the failure of Abner Lester, the elder, to fulfil his contract with his son, and his conveyance of the land in controversy to the defendants,, was a gross breach of faith and fraud upon the plaintiffs, and that the defendants are responsible for the-fraud, and that said deed is fraudulent, and should be set aside and annulled, and there should be a decree of specific performance by the conveyance of the land in controversy to the plaintiffs, and that the judgment in ejectment against them should be perpetually injoined.,